IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GENERAL NUTRITION CENTERS, INC., GNC FRANCHISING, LLC and GENERAL NUTRITION INVESTMENT COMPANY, | CIVIL ACTION NO. _____ |
| Plaintiffs, | |
| vs. | |
| GENERAL NUTRITION OPERATORS ASSOCIATION, LARRY BECK, RICH STANLEY, NOAH ROBINSON, SCOTT TAYLOR, HAROLD RICK BRAWNER, RICHARD CORNELL,  JASON RULE, RYAN HESSE, JOHN TSIONES, SCOTT JOHNSON, ERIC MILLER, LIVE ENTERPRISES, INC., NUTRITION ENTERPRISES, INC., POOH ENTERPRISES, INC., MIND AND BODY, INC., FJT CORP., HOMER NUTRITION, INC., RW NUTRITION LLC, and H & H NUTRITION, LLC | |
| Defendants. | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiffs General Nutrition Centers, Inc., GNC Franchising, LLC and General Nutrition Investment Company (collectively "GNC") files this complaint against General Nutrition Operators Association ("GNOA"), Larry Beck ("Beck"), Rich Stanley ("Stanley"), Noah Robinson ("Robinson"), Scott Taylor ("Taylor"), Harold Rick Brawner ("Brawner"), Richard Cornell ("Cornell"), Jason Rule ("Rule"), Ryan Hesse ("Hesse"), John Tsiones ("Tsiones"), Scott Johnson ("Johnson"), Eric Miller ("Miller"), Live Enterprises, Inc., Nutrition Enterprises, Inc., Pooh Enterprises, Inc., Mind and Body, Inc., FJT Corp., Homer Nutrition, Inc., RW Nutrition L.L.C., and H & H Nutrition, LLC.  Robinson, Taylor, Brawner, Cornell, Rule, Hess, Tsiones, Johnson, Miller, Live Enterprises, Inc., Nutrition Enterprises, Inc., Pooh Enterprises,

1

Inc., Mind and Body, Inc., FJT Corp., Homer Nutrition, Inc., RW Nutrition, L.L.C., and H & H Nutrition, LLC collectively shall be referred to as the "Franchisee Defendants." GNOA, Beck, Stanley and the Franchisee Defendants collectively shall be referred to as the "Defendants."

## I. PARTIES

1.    Plaintiff General Nutrition Centers, Inc. is a Delaware corporation with its principal place of business at 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222. Due to the actions of Defendants, as described in detail below, General Nutrition Centers, Inc. has been injured in Pittsburgh, Pennsylvania.

2.    Plaintiff GNC Franchising, LLC is a Pennsylvania limited liability company with its principal place of business at 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222. GNC Franchising, LLC, formerly known as GNC Franchising, Inc., is a party to the franchise agreements referenced below. Due to the actions of Defendants, as described in detail below, GNC Franchising, LLC has been injured in Pittsburgh, Pennsylvania.

3.    Plaintiff General Nutrition Investment Company is an Arizona corporation with its principal place of business at 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222. General Nutrition Investment Company is the owner of certain federally-registered trademarks, common-law trademarks and trade names ("Proprietary Marks").[1] Due to the actions of Defendants, as

---

[1] The Registered Marks, the Common Law Marks, and the Trade Names, as defined below, are collectively referred to herein as the "Proprietary Marks":

    (a)    The federally-registered trademarks include GENERAL NUTRITION CENTER GNC®, GENERAL NUTRITION CENTERS®, and GNC®, and are collectively referred to herein as the "Registered Marks."

    (b)    The common-law trademarks include "GNC", "GNC" [stylized], "GNC GENERAL NUTRITION CENTERS WHERE AMERICA SHOPS FOR HEALTH", "GNC GENERAL NUTRITION CENTERS LIVE WELL", and three marks for "GNC LIVE WELL", and are collectively referred to herein as the "Common Law Marks."

Active\3589751.1

described in detail below, General Nutrition Investment Company has been injured in Pittsburgh, Pennsylvania.

4.       Defendant GNOA is an Illinois corporation with its principal place of business at 123 West Madison, Suite 806, Chicago, Illinois 60602.

5.       Defendant Beck is an individual who resides in the State of Illinois.  Upon information and belief, Beck is GNOA's Executive Director and can be served at 123 West Madison, Suite 806, Chicago, Illinois 60602.

6.       Defendant Stanley is an individual who resides in the State of California.  Stanley was previously employed by GNC from 1976 until 2001.  Upon information and belief, while committing the conduct described in this complaint, Stanley was acting as an agent for and on behalf of Johnson.   Upon information and belief, Stanley is the Chairman of the Vendor Committee of GNOA and can be served at 123 West Madison, Suite 806, Chicago, Illinois 60602.

7.       Defendant Robinson is an individual who resides in the state of Illinois.  Robinson is a former GNC franchisee who operated three GNC stores located in Chicago, Illinois.[2]  Upon

---

(c)      The trade names include "GENERAL NUTRITION CORPORATION", "GNC CORPORATION", "GENERAL NUTRITION, INCORPORATED", "GENERAL NUTRITION CENTERS, INC.", "GENERAL NUTRITION COMPANIES, INC.", "GENERAL NUTRITION INVESTMENT COMPANY", and "GNC FRANCHISING, LLC", and are collectively referred to herein as the "Trade Names."

[2] Robinson's franchise agreements were terminated on August 24, 2005 and were the subject of separate litigation in the case captioned *Robinson v. GNC Franchising, Inc.*, Civ. Action No. 05CV5405, in the United States District Court for the Northern District of Illinois, Eastern Division (the "Illinois Case").  On October 7, 2005, the court marked the Illinois Case case closed.

information and belief, Robinson is the President of the Board of Directors of GNOA and can be served at 123 West Madison, Suite 806, Chicago, Illinois 60602.

8.      Defendant Taylor is an individual who resides at 1682 Meadow Chase Lane, Knoxville, Tennessee 37931.  Taylor is a GNC franchisee who operates three GNC stores located in Knoxville, Tennessee.  Upon information and belief, Taylor is the Vice President of the Board of Directors of GNOA and a member of the Vendor Committee of GNOA.

9.      Nutrition Enterprises, Inc. is a Texas corporation with its principal place of business at 165 Sendero Verde, San Antonio, Texas 78261.  Nutrition Enterprises, Inc. is a GNC franchisee that operates at least three stores in San Antonio and Austin, Texas.  Upon information and belief, Brawner is the president of Nutrition Enterprises, Inc., and he has committed the acts described in this Complaint on behalf of both himself and on the company's behalf.

10.     Live Enterprises, Inc. is a Texas corporation with its principal place of business at 10205 Oasis Street, Suite 200, San Antonio, Texas 78216.  Live Enterprises, Inc. is a GNC franchisee that operates at least two GNC stores located in Texas.  Upon information and belief, Brawner is the president of Live Enterprises, Inc., and he has committed the acts described in this Complaint on behalf of both himself and on the company's behalf.

11.     Defendant Brawner is an individual who resides at 165 Sendero Verde, San Antonio, Texas 78261.  Brawner is president of Nutrition Enterprises, Inc., and has agreed to be individually bound by the franchise agreements executed by Nutrition Enterprises, Inc.  Brawner is also president of Live Enterprises, Inc. and has agreed to be individually bound by the franchise agreements executed by Live Enterprises, Inc.  Upon information and belief, Brawner

4

is the Treasurer of the Board of Directors of GNOA and a member of the Vendor Committee of GNOA.

12.     Defendant Pooh Enterprises, Inc. is a Michigan corporation with its principal place of business at 4000 Highgate, Muskegon, Michigan 49441.  Pooh Enterprises, Inc. is a GNC franchisee that operates at least one store in Michigan.  Upon information and belief, Cornell is the president of Pooh Enterprises, and he has committed the acts described in this Complaint on behalf of both himself and on the company's behalf.

13.     Defendant Cornell is an individual who resides at 4000 Highgate Road, Muskegon, Michigan 49441.  Cornell is president of Pooh Enterprises, Inc., and has agreed to be individually bound by the franchise agreement(s) executed by Pooh Enterprises, Inc.  Upon information and belief, Cornell is the Secretary of the Board of Directors of GNOA.

14.     Defendant RW Nutrition, L.L.C. is a Florida limited liability company with its principal office at 1529 SW 53rd Lane, Cape Coral, Florida 33914.  RW Nutrition, L.L.C. is a GNC franchisee that operates at least one GNC store located in Fort Meyers, Florida. Upon information and belief, Hesse operates or has an ownership interest in RW Nutrition, L.L.C., and he has committed the acts described in this Complaint on behalf of both himself and on the company's behalf.

15.     Defendant H & H Nutrition, LLC is a Florida limited liability company with its principal place of business at 5995 Southpointe Blvd., Suite 107, Fort Meyers, Florida 33919. H & H Nutrition, LLC is a GNC franchisee that operates at least one GNC store located in Fort Meyers, Florida. Upon information and belief, Hesse operates or has an ownership interest in H & H Nutrition, LLC, and he has committed the acts described in this Complaint on behalf of both himself and on the company's behalf.

5

16.     Defendant Hesse is an individual who resides at 1592 SW 53rd Lane, Cape Coral, Florida 33914.  Hesse is a member of RW Nutrition, L.L.C., and has agreed to be individually bound by the franchise agreement executed by RW Nutrition, L.L.C.  Upon information and belief, Hesse also operates or has an ownership interest in H & H Nutrition, LLC, and he has agreed to be individually bound by the franchise agreement executed by H & H Nutrition, LLC. Upon information and belief, Hesse is a member of the Board of Directors of GNOA and a member of the Vendor Committee of GNOA.

17.     Defendant Mind and Body, Inc. is a Kansas corporation with its principal place of business at 2510 Timber Drive, Hays, Kansas 67601.  Mind and Body, Inc. is a GNC franchisee that operates one store located in Kansas. Upon information and belief, Rule is the president of Mind and Body, Inc. and he has committed the acts described in this Complaint on behalf of both himself and on the company's behalf.

18.     Defendant Rule is an individual who resides at 2510 Timber Drive, Hays, Kansas 67601.  Rule is a GNC franchisee who operates GNC stores located in Kansas and Missouri. Rule is also president of Mind and Body, Inc., and has agreed to be individually bound by the franchise agreements executed by Mind and Body, Inc.  Upon information and belief, Rule is a member of the Board of Directors of GNOA and a member of the Vendor Committee of GNOA.

19.     Defendant Homer Nutrition, Inc. is an Illinois corporation with its principal place of business at 14144 South Bell Road, Homer Glen, Illinois 60491.  Homer Nutrition, Inc. is a GNC franchisee that operates at least one store in Illinois. Upon information and belief, Tsiones is the president of Homer Nutrition, Inc., and he has committed the acts described in this Complaint on behalf of both himself and on its behalf.

6

20.     Defendant FJT Corp. is an Illinois corporation with its registered office at 9959 South Roberts Road, Palos Hills, Illinois 60465.  FJT Corp. is a GNC franchisee that operates at least one store in metro Chicago.  Upon information and belief, Tsiones is the president of FJT Corp., and he has committed the acts described in this Complaint on behalf of both himself and on the company's behalf.

21.     Defendant Tsiones is an individual who resides at 20865 W. Boulder, Plainfield, Illinois 60844.  Tsiones is president of FJT Corp. and has agreed to be individually bound by the franchise agreements executed by FJT Corp.   Tsiones is also treasurer of Homer Nutrition, Inc. and has agreed to be individually bound by the franchise agreement executed by Homer Nutrition, Inc.  Upon information and belief, Tsiones is a member of the Board of Directors of GNOA and a member of the Vendor Committee of GNOA.

22.     Defendant Johnson is an individual who resides at 885 Claycraft Road, Columbus, Ohio 43230.  Johnson is a GNC franchisee who operates or has an ownership interest in 17 GNC stores located in Miami and Fort Lauderdale, Florida; Columbus, Ohio, New Orleans, Louisiana; and St. Louis, Missouri. Upon information and belief, Stanley is an agent for Johnson, and in that capacity and on Johnson's behalf, Stanley committed the wrongful conduct described in this complaint.

23.     Defendant Miller is an individual who resides in the state of Pennsylvania.  Miller is a GNC franchisee who operates eight GNC stores located in New Jersey and Pennsylvania. Upon information and belief, Miller is a member of the Vendor Committee of GNOA.

## II.  JURISDICTION AND VENUE

24.     This is an action for cybersquatting, trademark infringement, unfair competition and trademark dilution under the Trademark Act of 1946, as amended 15 U.S.C. §1051, *et seq.* ("Lanham Act").  This is also an action for state-law unfair competition, trademark dilution,

7

defamation, trade disparagement, trade libel/commercial disparagement, tortious interference with existing contracts, and breach of contract. The Court has subject-matter jurisdiction over the Lanham Act counts (1-3 & 5) under 28 U.S.C. §§ 1331-32, 1338(a) and (b), and 15 U.S.C. §§ 1114, 1117(a), and 1125(a), (c) and (d). This Court also has subject matter jurisdiction over the state law claims (4, 6-11) under 28 U.S.C. § 1367(a) because these state law counts are so related to claims in the action which are within this Court's original jurisdiction, and they derive from a common nucleus of operative facts, that they form part of the same case or controversy under Article III of the United States Constitution. In addition, the amount in controversy exceeds the value of $75,000 exclusive of costs and interest, and there is complete diversity of citizenship between the Plaintiffs and each Defendant.

25.     Venue is proper in this district under 28 U.S.C. §§ 1391(b). A substantial part of the events giving rise to the claims occurred in this judicial district, and a significant number of witnesses and other factual evidence may be found in this judicial district. In addition, venue is proper in this Court because the franchise agreements, out of which a number of the causes of action arises, and to which a number of the causes of action expressly relates, provide that any action brought by GNC against the Franchisee Defendants (who make up the vast majority of the Defendants) shall be brought in the Commonwealth of Pennsylvania in the judicial district in which GNC has its principal place of business, and further provide that the Franchisee Defendants unconditionally accept such venue.

26.     Defendants also operate and maintain an online virtual store that is available and accessible to consumers in Pittsburgh, Pennsylvania, and upon information and belief, have sold

and continue sell to sell products in this United States judicial district, and have contributed to the sale of products in this United States judicial district.[3]

### III.   FACTS GIVING RISE TO THIS ACTION

**A.     The GNC System.**

27.     GNC Franchising, LLC, as a result of the expenditure of time, skill, effort and money, has developed and owns a unique and comprehensive system relating to the opening and operation of retail nutrition, health and/or fitness stores ("General Nutrition Centers"), which sell, among other things, vitamin and mineral supplements, sports-nutrition products, herbs, health foods, cosmetics and miscellaneous health-care products, diet products, sports accessories, fitness products, and specialty-workout apparel, and which are staffed by employees dedicated exclusively to serving customers for these products and services (collectively, the "System").

**B.     The GNC Proprietary Marks.**

28.     GNC identifies the System by means of certain trademarks, trade names, service marks, logos, emblems and other indicia of origin, including, but not limited to the Proprietary Marks.

29.     GNC has used and promoted the Proprietary Marks on products, stores and its websites and in marketing brochures, signage, promotional flyers, and print advertising, among other things.   As a result of extensive use and promotion of the Proprietary Marks, the Proprietary Marks have become famous within the dietary-supplement industry and have acquired a favorable reputation amongst customers as an identifier and symbol of GNC and its products.  GNC has invested and continues to invest substantial sums in promoting its products

---

[3] As described below, during the relevant period, Defendants maintained a website that advised purchasers that in order to purchase products, they must enter their credit card numbers.  In other words, the entire sale could be made while the customer was logged onto the website.  Thus, the website operated like a virtual store.

Active\3589751.1

offered under the Proprietary Marks.  Accordingly, GNC is the owner of both broad federal and common-law trademark rights in the Proprietary Marks.  Below is a description of the Proprietary Marks, including the Registered Marks, the Common Law Marks and the Trade Names.

30.     GNC Registered Marks include:

     a.     **"GENERAL NUTRITION CENTERS GNC®".**  General Nutrition Investment Company owns U.S. Trademark Registration No. 807,650 for the word mark "GENERAL NUTRITION CENTER GNC" for retail services specializing in the sale of health food, supplements and vitamins.  *See* Ex. A.   This registration has been valid since April 26, 1966.  General Nutrition Investment Company licenses the right to use the mark "GENERAL NUTRITION CENTER GNC" to the other Plaintiffs.  GNC has used this mark continuously in connection with the System since at least as early as June 15, 1963.

     b.     **"GNC GENERAL NUTRITION CENTERS®".**  General Nutrition Investment Company owns U.S. Trademark Registration No. 1,786,007 for the word mark "GNC GENERAL NUTRITION CENTERS" for retail store services specializing in food processing, the sale of health foods, supplements, vitamins and minerals, fitness products and apparel, cosmetics, oral and body care, diagnostic exercise and calorie-control products.  *See* Ex. B.   This registration has been valid since August 3, 1993. General Nutrition Investment Company licenses the right to use the mark "GNC GENERAL NUTRITION CENTERS" to the remaining Plaintiffs.  GNC has used this mark continuously in connection with the System since at least as early as March 4, 1990.

     c.     **"GNC®".** General Nutrition Investment Company owns U.S. Trademark Registration No. 2,180,647 for the word mark "GNC" for dietary supplements.  *See* Ex.

10

C. This registration has been valid since August 11, 1998. General Nutrition Investment Company licenses the right to use the mark "GNC" to the remaining Plaintiffs. GNC has used this mark continuously in connection with the System since at least as early as January 1, 1964.

31. GNC Common Law Marks include:

a. **"GNC".** Beginning at least as early as June 15, 1963, and continuing uninterrupted to the present, GNC has used the trademark "GNC" in interstate commerce in connection with, among other things, nutritional supplements and retail stores specializing in the sale of health foods, supplements and vitamins. This mark was registered on August 10, 1971, as U.S. Trademark Registration No. 918,234.

b. **"GNC" [stylized].** Beginning at least as early as January 15, 1978, and continuing uninterrupted to the present, GNC has used a stylized version of the trademark "GNC" in interstate commerce in connection with, among other things, nutritional supplements and retail health food store services. This mark was registered on April 21, 1981, as U.S. Trademark Registration No. 1,152,007.

c. **"GNC GENERAL NUTRITION CENTERS WHERE AMERICA SHOPS FOR HEALTH"**. Beginning at least as early as March 4, 1990, and continuing uninterrupted to the present, GNC has used the trademark "GNC GENERAL NUTRITION CENTERS WHERE AMERICA SHOPS FOR HEALTH" in interstate commerce in connection with, among other things, nutritional supplements and retail store services specializing in food processing, the sale of health foods, supplements, vitamins and minerals, fitness products and apparel, cosmetics, oral and body care, diagnostic exercise and calorie control products. This mark was registered on November

11

23, 1963, as U.S. Trademark Registration No. 1,806,566.

d. **"GNC GENERAL NUTRITION CENTERS LIVE WELL".** Beginning at least as early as April 30, 1996, and continuing uninterrupted to the present, GNC has used the trademark "GNC GENERAL NUTRITION CENTERS LIVE WELL" in interstate commerce in connection with, among other things, nutritional supplements and retail health food store services. This mark was registered on August 26, 1997, as U.S. Trademark Registration No. 2,092,084.

e. **"GNC LIVE WELL".** Beginning at least as early as April 28, 1997, and continuing uninterrupted to the present, GNC has used the trademark "GNC LIVE WELL" in interstate commerce in connection with, among other things, bottled drinking water, bottled spring water and nutritional beverages, namely sport drinks. This mark was registered on September 29, 1998 as U.S. Trademark Registration No. 2,192,423. Beginning at least as early as October 7, 1997, and continuing uninterrupted to present, GNC has used the trademark "GNC LIVE WELL" in interstate commerce in connection with, among other things, dietary supplements in tablet, capsule and liquid form. This mark was registered on September 8, 1998 as U.S. Trademark No. 2,187,956. Beginning at least as early as October 17, 1997, and continuing uninterrupted to present, GNC has used the trademark "GNC LIVE WELL" in interstate commerce in connection with, among other things, a mail order catalog offering cosmetics, massagers, dietary supplements, dental products and aromatherapy products. This mark was registered on September 5, 1995, as U.S. Trademark Registration No. 2,187,955.

32. GNC, either itself or by and through its predecessors in title and interest or its related entities has and continues to use the following trade names in interstate commerce:

"GENERAL NUTRITION CORPORATION", "GNC CORPORATION", "GENERAL NUTRITION, INCORPORATED", "GENERAL NUTRITION CENTERS, INC.", "GENERAL NUTRITION COMPANIES, INC.", "GENERAL NUTRITION INVESTMENT COMPANY", and "GNC FRANCHISING, LLC".

**C.     The GNC Franchise Agreements.**

33.     GNC Franchising, LLC awards franchises to carefully-screened and qualified individuals and/or business entities to operate GNC "General Nutrition Centers" stores pursuant to the terms of comprehensive franchise agreements.

34.     Each of the Franchisee Defendants are parties to individual franchise agreements with GNC Franchising, LLC. Those franchise agreements (sometimes collectively referred to as the "Franchise Agreements") were executed on the following dates under the following circumstances:

a.     On June 4, 2002, Robinson executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at 730 South Dearborn in Chicago, Illinois.

b.     On January 28, 2003, Robinson executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at 244 State Street/Jackson in Chicago, Illinois.

c.     On March 28, 2003, Robinson executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Atrium Mall in Chicago, Illinois.

d.     On February 1, 1994, Taylor executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store, located at Northwest

13

Crossing, in Knoxville, TN 37912.  Taylor and GNC renewed that agreement with a separate Renew Franchise Agreement, executed May 3, 2004.

      e.      On January 12, 1996, Taylor and Tucker Duncan, jointly and severally, executed an agreement with GNC Franchising, LLC to operate a store located at Shops at Western Plaza in Knoxville, Tennessee.  On September 29, 2004, the agreement was assigned to and assumed by Taylor.  On February 1, 2005, the franchise was relocated to Bi-Lo Shopping Center in Knoxville, Tennessee.  On December 9, 2005, Taylor executed a Renew Franchise Agreement with GNC for continued operation of the store located at Bi-Lo Shopping Center.

      f.      On August 9, 2001, Taylor executed an agreement with GNC Franchising, LLC to operate a store located at The Pavilion at Turkey Creek in Knoxville, Tennessee.

      g.      On June 11, 1996, Nutrition Enterprises, Inc., through its president, Defendant Brawner, and its secretary, Ann Wenglein-Brawner, executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Northwoods Center in San Antonio, Texas.  Defendant Brawner and Ann Wenglein-Brawner agreed "to be individually bound by all the terms and conditions" of the agreement.

      h.      On December 22, 1997, Nutrition Enterprises, Inc., through its president, Defendant Brawner, and its secretary, Ann Wenglein-Brawner, executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Sunset Valley Village in Austin, Texas.  Defendant Brawner and Ann Wenglein-Brawner agreed "to be individually bound by all the terms and conditions" of the agreement.

      i.      On March 18, 1998, Nutrition Enterprises, Inc., through its president,

14

Defendant Brawner, and its secretary, Ann Wenglein-Brawner, executed an agreement with GNC Franchising, LLC to operate a store located at Huebner Oaks Shopping Center in San Antonio, Texas. On September 3, 1998, the agreement was assigned to and assumed by Live Enterprises, Inc. Defendant Brawner and Ann Wenglein-Brawner agreed "to be individually bound by all terms and conditions" of the agreement.

      j.     On September 10, 1999, Nutrition Enterprises, Inc., through its president, Defendant Brawner, and its secretary, Ann Wenglier-Brawner, executed an agreement with GNC Franchising, LLC to operate a store located at Bandera Trails in San Antonio, Texas. The site of the store was later changed to HEB Shopping Center in San Antonio, Texas. On October 26, 1999, the agreement was assigned to and assumed by Live Enterprises, Inc. Defendant Brawner and Ann Wenglein-Brawner agreed "to be individually bound by all the terms and conditions" of the agreement.

      k.     On November 3, 1999, Nutrition Enterprises, Inc., through its president, Defendant Brawner, and its secretary, Ann Wenglein-Brawner, executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Blanco Market in San Antonio, Texas. Defendant Brawner and Ann Wenglein-Brawner agreed "to be individually bound by all the terms and conditions" of the agreement.

      l.     On June 12, 1996, Defendant Cornell and Stacey Cornell executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Green Ridge Square in Walker, Michigan. On December 26, 1996, the agreement was assigned to and assumed by Pooh Enterprises, Inc. Defendant Cornell and Stacey Cornell agreed "to be individually bound by all the terms and conditions" of the agreement.

15

m.      On May 6, 2003, Mind and Body, Inc., through its president, Defendant Rule, and its secretary, Valery Rule, executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Mall at Hays in Hays, Kansas. Rule and Valery Rule agreed "to be individually bound by all the terms and conditions" of the agreement.

n.      On April 29, 2004, Defendant Rule and Valery Rule executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Thompson Hills Shopping Center in Sedalin, Missouri.

o.      On August 6, 2004, Hesse and Wade Herley executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Summerlin Crossing in Ft. Meyers, Florida.  On September 13, 2004, the agreement was assigned to and assumed by RW Nutrition, L.L.C.  Hesse and Wade Herley agreed "to be individually bound by all the terms and conditions" of the agreement.

p.      On April 12, 2004, Wade Herley entered into an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store at South Pointe Commons in Ft. Meyers, Florida.  On July 9, 2004, the agreement was assigned to and assumed by H & H Nutrition, LLC.  Hesse and Wade Herley agreed "to be individually bound by all the terms and conditions" of the agreement.

q.      On May 8, 2001, Defendant Tsiones and Frank Tsiones executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located in metro Chicago, Illinois.  On July 12, 2002, the agreement was assigned to and assumed by FJT Corp.  Defendant Tsiones and Frank Tsiones agreed "to be individually bound by all the terms and conditions" of the agreement.

16

r.      On November 23, 2004, Homer Nutrition, Inc. executed an agreement with GNC Franchising, LLC to operate a GNC General Nutrition Centers store located at Homer Town Square in Homer Glen, IL.  Defendant Tsiones agreed "to be individually bound by all the terms and conditions" of the agreement.

s.      Upon information and belief, Johnson has executed a number of agreements with GNC Franchising, LLC to operate 17 different GNC General Nutrition Centers stores at the following locations:   Bird Ludlum Shopping Center in Miami, Florida; Colonial Palms Shopping Center in Miami, Florida; Health Food Center in Columbus, Ohio; Old Metairie Village in Metairie, Louisiana; Plaza Ninety Four in St. Peters, Missouri; Shoppes of Coral Way in Miami, Florida; Westgate Shopping Center in Metairie, Louisiana; LaFayette Center in Manchester, Missouri; Schnuck's O'Fallon Shopping Center in O'Fallon, Missouri; Essex Shopping Center in Hialeah, Florida; Magazine Commons in New Orleans, Louisiana; 1448 West Fifth Avenue in Columbus, Ohio; Dorsett/270 Plaza in Maryland Heights, Missouri; Brice Park Center in Reynoldsburgh, Ohio; St. Ann Place Shopping Center in Mandeville, Louisiana; and Elmwood Village Plaza in New Orleans, Louisiana.

t.      Miller has executed a number of agreements with GNC Franchising to operate eight GNC General Nutrition Centers stores at the following locations: Mansfield Commons in Hackettstown, New Jersey; Riverview Plaza in Philadelphia, Pennsylvania; Chester Pike Plaza in Sharon Hill, Pennsylvania; Center Point Place in Warminster, Pennsylvania; Hamilton Marketplace in Hamilton, New Jersey; Castor-Cottman Shopping Center in Philadelphia, Pennsylvania;   Royersford Center in Royersford, Pennsylvania; and Aldrich Shopping Center in Howell, New Jersey.

35.    All of the Franchise Agreements contain, among other things, the following material provisions.

a.    <u>Franchisees cannot engage in the unauthorized use of the Proprietary Marks, including their use in a domain name.</u>  The Franchise Agreements provide that:

> Franchisee shall use [the Proprietary Marks] only in the manner authorized and permitted by Franchisor.[4]  Any unauthorized use thereof shall constitute an infringement of Franchisor's rights.
>
> . . .
>
> Franchisee shall not use the Proprietary Marks or other marks proprietary to Franchisor in its corporate name, domain name or any fictitious name.[5]

b.    <u>Franchisees cannot sell similar products over the Internet.</u>  The Franchise Agreements provide that "Franchisee shall not operate a mail order, direct mail, catalog, telemarketing, wholesale, distribution, direct marketing, or similar business, including

---

[4] Reference to "Franchisor" in these provisions refers to GNC Franchising, LLC, the party (or the successor in interest to the party) that executed the Franchise Agreements.

[5] The Franchise Agreements also make clear that the Franchisor — and not the Franchisee — has the exclusive right and interest in and to the Proprietary Marks:

> As between the parties hereto, Franchisor has the exclusive right and interest in and to the Proprietary Marks and other marks proprietary to Franchisor and the goodwill associated with and symbolized by them.
>
> . . .
>
> Franchisee's use of the Proprietary Marks and other marks proprietary to Franchisor pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to such marks and all goodwill arising from Franchisee's use of the Proprietary Marks and other marks proprietary to Franchisor in its franchised operation under the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks and other marks proprietary to Franchisor.

without limitation, through the use of the Internet, which permits customers to purchase and receive products or services without being present" at a GNC General Nutrition Centers retail store.

     c.     <u>During the term of the Franchise Agreements, Franchisees cannot sell similar products wholesale</u>.  The Franchise Agreements provide the following restrictions, which apply during the terms of the Franchise Agreements:

> Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company:
>
> > a)     Divert or attempt to divert any business or customer of the business franchised hereunder to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks, other marks proprietary to Franchisor and the System;
> >
> > . . .
> >
> > c)     Own, maintain, advise, help, invest in, make loans to, be employed by, engage in, or have any interest in any similar business including without limitation any wholesale distribution, direct marketing or retail business that offers for sale goods or services which are similar to those distributed to or offered at the Store.

     d.     <u>For one year after the term of the Franchise Agreements, Franchisees cannot compete with GNC.</u>  The Franchise Agreements also provide the following post-termination covenant-not-to-compete:

> Except as otherwise approved in writing by Franchisor for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, and continuing for one (1) year thereafter, regardless of the cause for termination and regardless of which party terminates the Agreement, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or limited liability company own, maintain, advise, help, invest in,

19

make loans to, be employed by, engage in, or have any interest in any direct marketing or retail business that offers for sale goods or services similar to those distributed to or offered at the Store . . ..

e.    <u>Franchisees cannot publish statements that might injure GNC</u>.  In addition to the prohibition against injuring or prejudicing the goodwill associated with the Proprietary Marks described in subparagraph (c) above, the Franchise Agreements further provide that "[a]ll advertising and promotion by Franchisee shall be completely factual" and that "Franchisee agrees to refrain from any business or advertising practice which may be injurious to the business of Franchisor and the goodwill associated with GNC Brand Supplements, the Proprietary Marks,[6] and other marks proprietary to Franchisor and other GNC stores."

f.    <u>Franchisees must pay GNC's attorney's fees</u>.  Finally, the Franchise Agreements provide that when GNC is the prevailing party in litigation against the Franchisees, GNC "shall recover its reasonable costs and expenses, including attorney's fees incurred with respect to the dispute."

**D.    Defendants' Wrongful and Illegal Acts.**

36.    <u>GNOA's alleged mission</u>.  On or about April 27, 2005, certain of the Defendants formed GNOA.  The Defendants claim that GNOA's mission it to "protect and promote the economic interests of General Nutrition Franchisees."  *See* Exs. E, H and I.  Whether this is GNOA's only mission is doubtful, as GNOA has actively defamed, libeled, and disparaged GNC

---

[6] The Franchise Agreements define "Proprietary Marks" as follows:

Franchisor identifies the System by means of certain trademarks, trade names, service marks, logos, emblems, and other indicia of origin, including but not limited to the GNC GENERAL NUTRITION CENTER and GNC LIVE WELL marks, and such other trade names, service marks, and trademarks as are now designated (and may hereafter be designated by Franchisor) for use to identify the System . . ..

Active\3589751.1

and GNC's Proprietary Marks, for the purpose of inducing GNC franchisees into breaching their Franchisee Agreements with GNC.

37.     The www.gncoperators website.  On July 5, 2005, GNOA registered the domain name www.gncoperators.com.  This website is registered to GNOA and managed by GNOA's Executive Director, defendant Larry Beck.  *See* Ex. D.

       a.     Domain Name Infringements and Corresponding Breaches.  By their unauthorized use of the "GNC" marks and other Proprietary Marks in the www.gncoperators.com domain name, the Defendants violated the Lanham Act, as well as committed violations of Pennsylvania state law unfair competition and trademark dilution laws ("Domain Name Infringements").  In addition, by this same unauthorized use of the "GNC" marks and other Proprietary Marks in the domain name, the Franchisee Defendants also breached their Franchise Agreements ("Domain Name Infringement Breaches").

       b.     Website Infringements and Corresponding Breaches.  On every page of the www.gncoperators.com website, the Defendants made unauthorized use of the words "GENERAL NUTRITION", as part of the mark "GENERAL NUTRITION OPERATORS ASSOCIATION".  *See* Ex. E.  Furthermore, on the website, the Defendants made unauthorized uses of the "GNC" marks, by advertising that the "first order gets an additional 10% off of GNC's cost," and for certain products, "GNC price is below wholesale."  *See* Ex. E.  By such unauthorized uses of the Proprietary Marks on the various web pages, Defendants violated the Lanham Act and committed violations of state-law unfair competition and trademark dilution.  ("Website Infringements").  Additionally, by these same unauthorized uses of the Proprietary Marks, the Franchisee

21

Defendants also breached their Franchise Agreements. (the "Website Infringement Breaches").

       c.    <u>Internet Sales Breaches.</u>  On the website, Defendants offered to provide the GNC franchisees with products similar to those distributed to or offered at GNC General Nutrition Centers stores in exchange for "annual dues." *See* Ex. E. Specifically, Defendants would provide customers with $450 worth of products similar to those distributed to or offered at GNC General Nutrition Centers stores, in exchange for a payment of $200. *See* Ex. E. In addition, Defendants advertised that in exchange for the $200 fee, customers could receive additional free or wholesale-discounted products similar or identical to those distributed to or offered at GNC General Nutrition Centers stores from various vendors, whose website links were provided. *See* Ex. E. Defendants reminded customers, however, that "GNOA will work with the vendors to ensure delivery of these products—but you must join first!" *See* Ex. E. By selling similar or identical products to those distributed to or offered at GNC General Nutrition Centers stores directly over Defendants' interactive website[7] and assisting vendors in selling to customers through the vendor websites, the Franchisee Defendants breached their Franchisee Agreements. ("Internet Sales Breaches").

       d.    <u>Wholesaler and Competitor Breaches.</u>  On the website, Defendants advertised that "[a]nnual dues are only $200 per store, and you will receive over $450

---

[7] The website was "interactive" because customers were able to purchase these products directly off the website. In order to purchase the products, the website instructed the customers first to "[f]ill-out [sic] the on-line registration form." Next, the customers could pay directly over the website by credit card. *See* Ex. E. Upon information and belief, through the www.gncoperators.com website, customers had the capability of purchasing the Defendants' products without the necessity of mailing in an order form, placing an order over the telephone, or even placing an order through e-mail.

22

(wholesale) in free product from our vendors." *See* Ex. E. Defendants also encouraged customers to purchase wholesale products similar or identical to those distributed by or offered at GNC General Nutrition Centers stores directly from various vendors. For example, Defendants advertised that customers could purchase from *Peak Performance Labs* "$200 (wholesale) in free products of your choice." *See* Ex. E. Defendants also advertised that customers could purchase products from *Nasutra*, for which the "GNC price is below wholesale." *See* Ex. E. On information and belief, and as evidenced by this website, Defendants own, maintain, advise, and/or help in wholesale distribution of goods or services that are similar or identical to those distributed or offered at GNC General Nutrition Centers stores. Furthermore, by becoming wholesale distributors, Defendants became competitors of GNC, and upon information and belief, have diverted or attempted to direct GNC franchisees to Defendants' competing businesses. By engaging in the described acts, Franchisee Defendants breached the terms of their Franchisee Agreements. ("Wholesaler and Competitor Breaches").

      e.      <u>Post-Termination Breaches</u>. Upon information and belief, within one year from the date that Robinson's Franchise Agreements were terminated, and through the distribution of products over the www.gncoperators.com website, Robinson owns, maintains, advises, and helps in a direct-marketing business that offers for sale goods similar or identical to those distributed or offered at GNC General Nutrition Centers stores. By these acts, Robinson breached additional terms of his Franchisee Agreements. ("Post-Termination Breaches").

      f.      <u>Tortious Interference</u>. By use of the www.gncoperators.com website, Defendants committed intentional and improper acts to induce GNC franchisees,

23

including Franchisee Defendants, to breach their respective Franchisee Agreements. Specifically, through the www.gncoperators.com website, Defendants induced GNC franchisees to commit (i) Domain Name Infringement Breaches, (ii) Webpage Infringement Breaches, (iii) Internet Sales Breaches, (iv) Wholesaler and Competitor Breaches, and (v) Post-Termination Breaches. ("Tortious Interference").

38.    _GNC demands that Defendants cease violations_.  On October 12, 2005, GNC sent both the Executive Director and the President of GNOA letters advising them of the Defendants' violations relating to the www.gncoperators.com website, and demanding that GNOA cease use of the Proprietary Marks and immediately destroy all brochures, signage, advertising materials, and other materials bearing the Proprietary Marks, including cancellation of the domain name www.gncoperators.com.  _See_ Ex. F.  Defendants did not comply with the demand.

39.    _The www.gnoa.biz website_.  On or about October 19, 2005, Defendants began operating a second website, this one with the domain name www.gnoa.biz.  This website is also registered to Beck (with GNOA listed as Beck's company), and is managed by Beck.  _See_ Ex. G.

a.    _Continued Infringements, Breaches, and Tortious Interference_.  At some point in late 2005, the Defendants adjusted the www.gncoperators.com website to automatically re-route users to www.gnoa.biz.  Other than the domain name, during the relevant time period, the www.gnoa.biz website remained virtually identical to the www.gncoperators.com website (collectively, the "Websites").    _See_ Ex. H.[8]

---

[8] The Websites appear to be revised and updated from time to time.  For example, at some point between November 3, 2005 and February 8, 2006, Defendants advertised a new sales promotion on the website:

> This new plan—zero dues—does not include the free product fills that we had before.  However, some of you may still want to get the free fill.  So for the next

Accordingly, through the gnoa.biz website (and by refusing to cancel the gncoperators.com website): (i) the Defendants continued to commit the Domain Name Infringements, the Website Infringements and the Tortious Interference; (ii) the Franchisee Defendants additionally continued to commit the Domain Name Infringement Breaches, Webpage Infringement Breaches, Internet Sales Breaches, and Wholesaler and Competitor Breaches, and (iii) Robinson additionally continued to commit the Post-Termination Breaches.

      b.   <u>Disparagement Torts</u>.  The www.gnoa.biz website also contains a variety of false and/or misleading statements about GNC, many of which are highly injurious to the business of GNC and the goodwill associated with GNC's products, services, and Proprietary Marks, and are disparaging, defamatory, and libelous ("Website Statements").  The Website Statements, some of which are listed below, constitute state-law defamation, trade disparagement, and trade libel/commercial disparagement ("Disparagement Torts"):

      1)    A September 12, 2005 press release appearing on www.gnoa.biz and stating, among other things:

          i.    "The GNC Corporation has been steadily reducing franchise operators' ability to make a living";

          ii.    GNC "engage[s] in restraint of trade";

          iii.    "GNC Corporation's business model is a disaster for franchisees"; and

          iv.    "[C]ustomer demands cannot be met due to the Franchisor Corporation's policy on sourcing and purchasing of supplies."

---

three weeks, we will continue to honor the paid membership of $200 per store; then you will receive the free fill.

*See* Ex. I.

*See* Exs. H-I.

2)    An October 13, 2005 news posting appearing on www.gnoa.biz and stating, among other things:

    i.    "GNOA has explicit proof of GNC's predatory pricing against it's [sic] own franchisees";

    ii.    "[T]he average franchisee cannot make a decent living by following the GNC plan"; and

    iii.    GNC has committed a "violation of the 'good faith and fair dealing' concept."

*See* Exs. H-I.

3)    An October 7, 2005 letter from GNOA's counsel appearing on www.gnoa.biz and stating, among other things:

    i.    GNC has engaged in "tortious interference with a business relationship";

    ii.    GNC is "requiring the [Franchisee] stores to carry certain products which history proves will not sell, and for which the franchisee takes a loss, simply to meet a fictitious standard Franchisor has created through its Ace Reports";[9]

    iii.    GNC is "[a]djusting the requirement for retail sales awards, which make it more difficult for franchisees to succeed";

    iv.    GNC is "[v]iolating the 2001 Class Action Settlement Agreement,[10] through such methods as coupon discounting";

---

[9] ACE is an acronym for "Assessing the Customer Experience," which is a GNC system implemented to promote system-wide store appearance and uniformity (a well-recognized tenet of franchising).

[10] On August 14, 2002, GNC and a class of franchisees reached a settlement in the case captioned *Jose Duarte, Baljinder Kaur, and Devindar Talwar On Behalf of Themselves and All Others Similarly Situated v. GNC Franchising, Inc*., Civil Action No. 00-332 in the United States District Court for the Western District of Pennsylvania.  Statements that GNC violated any provision of the settlement agreement are completely false.

> v.     GNC "owned stores [are] undercutting franchisee product prices";
>
> vi.    "There are issues that are internally destroying the structure of the Franchisor franchising system";
>
> vii.   GNC is "[t]erminating franchisees for a host of self-serving reasons"; and
>
> viii.  GNC is possibly involved in "a coordinated cover-up of the truth."

See Exs. H-I.

c.     <u>Injury Breach</u>.  Because the Website Statements are injurious to GNC's business and goodwill of its products and Proprietary Marks, the Franchisee Defendants breached additional terms of their Franchise Agreements ("Injury Breach").

d.     <u>Additional Tortious Interference</u>.  Upon information and belief, the Website Statements have also caused GNC franchisees to commit the various breaches described above.  Accordingly, through the www.gnoa.biz website, Defendants committed additional acts of Tortious Interference.

40.    <u>GNC again demands that Defendants cease violations</u>.  On November 22, 2005, GNC sent a letter to GNOA's attorney advising him of the Defendants' continued violations described above, and demanding the destruction of all brochures, signage, advertising materials, and any other materials that bear GNC's trademarks, including cancellation of the domain name www.gncoperators.com, and deletion of the GNC Proprietary Marks from any website owned, operated or controlled by GNOA.  *See* Ex. J.  Defendants did not comply with this demand. Instead of canceling the domain name www.gncoperators.com, the Defendants—in a poor attempt at irony or to cause concern for GNC franchisees—adjusted the www.gncoperators.com

website so that users are automatically re-routed to a website belonging to the law firm whose attorney sent the two demand letters on GNC's behalf.

41.    <u>The January 11 Letter and the additional violations</u>.  Defendants' attacks on GNC continued unabated into 2006.  On January 11, 2006, Defendants sent GNC franchisees a letter from the General Nutrition Operators Association (the "January 11 Letter").  This letter constitutes additional infringement by Defendants of the Proprietary Marks and corresponding breaches of the Franchisee Defendants' Franchise Agreements ("Letter Infringements").  In addition, the January 11 Letter contains the following statements, constituting further Disparagement Torts and Tortious Interference by Defendants and Injury Breach by the Franchisee Defendants ("January 11 Statements"):

> a.    "Your business as a GNC franchisee will not survive by using the GNC system alone"; and
>
> b.    "GNC is not paying attention to [Franchisees'] core business."

*See* Ex. K.

**E.    Irreparable Injury to GNC and to the Consuming Public.**

42.    The Defendants' Domain Name Infringements, Webpage Infringements, and Letter Infringements are likely to cause confusion, to cause mistake, and/or to deceive GNC's customers and potential customers about an affiliation, connection or association between GNC and the Defendants and/or their Websites.

43.    The Defendants are being unjustly enriched at GNC's expense by Defendants' Domain Name Infringements, Website Infringements and Letter Infringements.   These infringements deprive GNC of the ability to control the nature and quality of goods, services and information provided under its Proprietary Marks, and places GNC's valuable reputation and goodwill in the hands of Defendants, over whom GNC has no control.

28

44. The Defendants' Domain Name Infringements, Webpage Infringements, and Letter Infringements are further likely to cause confusion, to cause mistake and/or to deceive GNC's customers and potential customers as to the origin, sponsorship, or approval by GNC of Defendants' products and services.

45. GNC is also being irreparably injured by the Defendants' Domain Name Infringements, Website Infringements, Letter Infringements, Disparagement Torts and Tortious Interference. In addition, GNC is irreparably injured by the Franchisee Defendants' Domain Dame Infringement Breaches, Website Infringement Breaches, Internet Sales Breaches, Wholesaler and Competitor Breaches and Injury Breaches. Finally, GNC is being irreparably injured by Robinson's Post-Termination Breaches.

46. Unless this Court restrains the wrongfully and illegal acts identified in the preceding paragraph. Defendants will continue, causing irreparable injury to GNC and to the public for which there is no adequate remedy at law.

## IV. CAUSES OF ACTION

## COUNT 1. CYBERSQUATTING UNDER THE LANHAM ACT

47. GNC repeats and realleges paragraphs 1-46 above as if fully set forth herein.

48. Without regard to the goods or services of GNC, and despite their actual knowledge and notice that GNC is the owner of the Proprietary Marks, Defendants have registered, trafficked in, and/or used (and continue to register, traffic in and/or use) the domain name www.gncoperators.com. The use of "GNC" domain name www.gncoperators.com is identical to and/or confusingly similar to:

      a. The Registered Marks: GENERAL NUTRITION CENTER GNC® and GNC®;

      b. The Common Law Marks: (1) "GNC", (2) "GNC" [stylized], (3) "GNC

GENERAL NUTRITION CENTERS WHERE AMERICA SHOPS FOR HEALTH", (4) "GNC GENERAL NUTRITION CENTERS LIVE WELL", and (5) "GNC LIVE WELL"; and

c.       The Trade Names: (1) "GNC CORPORATION" and (2) "GNC FRANCHISING, L.L.C.".

49.       At the time the Defendants registered the domain name www.gncoperators.com, the Proprietary Marks listed in the preceding paragraph were distinctive and famous in the dietary supplement industry.

50.       In committing the acts complained of herein, Defendants acted with a bad-faith intent to profit from the Proprietary Marks as evidenced by its intent to divert consumers from GNC to a website using a domain name incorporating "GNC". Such actions trade off the good will of GNC's Proprietary Marks for commercial gain, and damage GNC by tarnishing or disparaging its Proprietary Marks, and by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of services sold under the infringing marks and between GNC and the Defendants.

51.       Defendants' acts complained of herein constitute cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d).

52.       As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its proprietary rights, and has sustained and will continue to sustain substantial injury to its business, valuable reputation, and goodwill in an amount that cannot be presently ascertained except by an accounting of damages.

53.       As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts.

30

54.     Accordingly, GNC is entitled to preliminary and permanent injunctive relief, actual damages, statutory damages and an order transferring the www.gncoperators.com domain name to GNC, and prohibiting Defendants from using any domain name incorporating, in any way, the Registered Marks GNC® or GENERAL NUTRITION CENTER GNC®, as well as the Common Law Marks "GNC", "GNC" (stylized), "GNC GENERAL NUTRITION CENTERS WHERE AMERICA SHOPS FOR HEALTH", "GNC GENERAL NUTRITION CENTERS LIVE WELL", "GNC LIVE WELL", and the trade names "GNC CORPORATION" and "GNC FRANCHISING, L.L.C.", or using any domain name confusingly similar thereto.

## COUNT 2.  TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT

55.     GNC repeats and realleges paragraphs 1- 54 above as if fully set forth herein.

56.     Defendants' actions complained of herein constitute willful and intentional infringement of GNC's valid and legally protectable Registered Marks: U.S. Reg. No. 807,650, U.S. Reg. No. 1,786,007, and U.S. Reg. No. 2,180,647 in violation of 15 U.S.C. § 1114.

57.     Through its Domain Name Infringements, Website Infringements and Letter Infringements, which repeatedly use the terms "GNC" and "GENERAL NUTRITION", as part of "GENERAL NUTRITION OPERATORS ASSOCIATION," Defendants are unlawfully and without authorization using and infringing upon the Registered Marks: "GNC®", "GENERAL NUTRITION CENTER GNC®", and "GNC GENERAL NUTRITION CENTERS®".

58.     GNOA has never been a GNC franchisee, and therefore has never been permitted to use the Registered Marks.  The Franchisee Defendants are only permitted to use the Registered Marks in a manner authorized and permitted by GNC, and any unauthorized use of these Registered Marks constitutes infringement.  The Domain Name Infringements, Website Infringements and Letter Infringements were never authorized by GNC.

59.     Thus, Defendants are using in commerce a reproduction, counterfeit, copy or colorable imitation of the Registered Marks in connection with the sale, offering for sale, distribution, or advertising of goods and services, and such use is likely to cause confusion, or to cause mistake, or to deceive as to the origin, source, affiliation or endorsement of Defendants' unauthorized use of the Registered Marks.

60.     Defendants' infringing activities have continued in spite of their constructive and actual knowledge of GNC's rights in the Registered Marks.

61.     As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its proprietary rights, and has sustained and will continue to sustain substantial injury to its business, reputation, and goodwill in an amount that cannot be presently ascertained except by an accounting of damages.  GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein pursuant to 15 U.S.C. § 1116.

62.     As a further direct and proximate result of Defendants' wrongful acts, Defendants have unlawfully derived income and profits.  Furthermore, as a result of Defendants' conduct in violation of the Lanham Act, GNC has sustained actual and consequential damages that will be established at trial.

63.     In view of the blatant nature of Defendants' infringement, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

### COUNT 3.  UNFAIR COMPETITION UNDER THE LANHAM ACT

64.     GNC repeats and realleges paragraphs 1-63 above as if fully set forth herein.

65.     The Defendants have engaged in activity intended to misrepresent to the public the source, nature, characteristics and quality of their products and services.  Specifically, the

32

Defendants made, and continue to make, misrepresentations that have deceived, and are likely to deceive, consumers into falsely believing that GNC is the source of the Websites and that GNC is affiliated with GNOA and/or the products and services sold by Defendants through the Websites. The Defendants have promoted GNOA, as well as their products and services through the Websites, with the consequent result that such promotion is likely to confuse, to cause mistake, or to deceive.

66.    Upon information and belief, such promotion has misled the public in bad faith with the intention of profiting from the consumers' mistaken belief that GNC is in some manner associated with GNOA, the Websites, and/or the products and services sold by Defendants through the Websites, by virtue of Defendants' unlawful use of the Proprietary Marks.

67.    Defendants' unauthorized use of "GNC" and "GENERAL NUTRITION" as part of "GENERAL NUTRITION OPERATORS ASSOCIATION" has had, and unless restrained will continue to have, the consequent result of saturating and overwhelming the market and causing a likelihood of confusion, thereby causing GNC to lose the value of its very valuable Proprietary Marks.

68.    The Defendants' aforementioned conduct occurred in the course of commerce and constitutes false designation of origin and false and misleading representations of fact. The aforementioned conduct is likely to cause or has caused confusion, mistake or deception—and if not enjoined, will continue to cause confusion and to deceive the public—as to the GNC's affiliation with, connection to, or association with GNOA, the Websites, the products and services sold by Defendants through the Websites, and as to whether the Defendants are authorized by GNC to use Proprietary Marks, when in fact there is no such affiliation, connection, association or authorization, all in violation of 15 U.S.C. § 1125(a).

33

69.     Defendants' aforesaid conduct is in violation of 15 U.S.C. § 1125(a), and at all relevant times, is and has been willful, malicious, and in conscious disregard of GNC's rights under 15 U.S.C. § 1125(a).

70.     As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its proprietary rights, and has sustained and will continue to sustain substantial injury to its business, reputation, and public goodwill in an amount that cannot be presently ascertained except by an accounting of damages.  GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein pursuant to 15 U.S.C. § 1116.

71.     As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts.  Furthermore, as a result of Defendants' conduct in violation of the Lanham Act, GNC has sustained actual and consequential damages that will be established at trial.

72.     In view of the blatant nature of the Defendants' infringement and unfair competition, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

### COUNT 4.  UNFAIR COMPETITION UNDER PENNSYLVANIA LAW

73.     GNC repeats and realleges paragraphs 1-72 above as if fully set forth herein.

74.     The Defendants' actions constitute false representations and false designations of origin that are likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association with GNC, or as to the origin, sponsorship or approval of Defendants' goods, services, or commercial activities by GNC.  Such actions constitute unfair competition in violation of Pennsylvania state law.

34

75.     As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its proprietary rights, and has sustained and will continue to sustain substantial injury to its business, reputation, and goodwill in an amount that cannot be presently ascertained except by an accounting of damages.  GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein.

76.     As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts. Furthermore, as a result of Defendants' conduct in violation of Pennsylvania state law, GNC has sustained actual and consequential damages that will be established at trial.

77.     In view of the blatant nature of the Defendants' infringement and unfair competition, this is an exceptional case.

## COUNT 5.  TRADEMARK DILUTION UNDER THE LANHAM ACT (FEDERAL TRADEMARK DILUTION ACT)

78.     GNC repeats and realleges paragraphs 1-77 above as if fully set forth herein.

79.     Defendants' unlawful and unauthorized commercial use of GNC's famous and inherently distinctive Proprietary Marks in interstate commerce, including use over the internet, constitutes dilution of GNC's Proprietary Marks, in violation of 15 U.S.C. § 1125(c).

80.     Defendants' unlawful and unauthorized commercial use of the Proprietary Marks did not begin until well after the Proprietary Marks had become famous and inherently distinctive in the dietary-supplement industry, and well-recognized and held in high esteem by consumers of GNC products.

81.     Defendants' unlawful and unauthorized commercial use of the Proprietary Marks has resulted in loss of the ability for the Proprietary Marks to serve as a unique identifier for

Active\3589751.1

GNC's products and services, causing the public to lessen or blur its association between GNC and its Proprietary Marks.

82. Further, Defendants' unlawful use of the Proprietary Marks has diluted, tarnished and degraded positive associations of the Proprietary Marks, has diluted the distinctive qualities of the Proprietary Marks, and has resulted in a loss of the ability of the Proprietary Marks to serve as unique identifiers of GNC's products.

83. Defendants' unlawful use of the Proprietary Marks has also diluted the distinctive quality of those marks by lessening the capacity of the distinctive marks to identify and distinguish GNC's goods and services.

84. The Registered Marks GENERAL NUTRITION CENTER GNC®, GENERAL NUTRITION CENTERS®, and GNC® are famous because they have been used continuously by GNC since 1963, 1964, and 1990, respectively. The Common Law Marks "GNC", "GNC GENERAL NUTRITION CENTERS WHERE AMERICA SHOPS FOR HEALTH", "GNC GENERAL NUTRITION CENTERS LIVE WELL", and "GNC LIVE WELL" are famous as they have been used continuously by GNC since as early as 1963, 1990, 1996 and 1997, respectively. The Trade Names "GENERAL NUTRITION CORPORATION", "GNC CORPORATION", "GENERAL NUTRITION, INCORPORATED", "GENERAL NUTRITION CENTERS, INC.", "GENERAL NUTRITION COMPANIES, INC.", "GENERAL NUTRITION INVESTMENT COMPANY", and "GNC FRANCHISING, LLC" are also famous and have been used continuously for a number of years. Since those times, GNC has continued to use the Proprietary Marks in its signage and brochures and in other ways common in the industry.

85. The Proprietary Marks are uniquely associated with the operation of the dietary-supplement industry in which GNC is engaged. The Defendants operate in this same dietary-

supplement industry and unlawfully seek to use the Proprietary Marks to compete with GNC throughout the United States and beyond.   Such conduct is likely to cause confusion amongst consumers regarding the Proprietary Marks.

86.     At all relevant times, Defendants' aforesaid conduct is and has been willful, malicious, and in conscious disregard of GNC's rights under 15 U.S.C. § 1125(c).

87.     As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its proprietary rights, and has sustained and will continue to sustain substantial injury to its business, reputation, and public goodwill in an amount that cannot be presently ascertained except by an accounting of damages.   GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein pursuant to 15 U.S.C. § 1116.

88.     As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts.   Furthermore, as a result of Defendants' conduct in violation of the Lanham Act, GNC has sustained actual and consequential damages that will be established at trial.

## COUNT 6.  TRADEMARK DILUTION UNDER PENNSYLVANIA LAW

89.     GNC repeats and realleges paragraphs 1-88 above as if fully set forth herein.

90.     The Registered Marks, which are the subject of federal registration, are famous in the dietary-supplement industry within the Commonwealth of Pennsylvania, and are held in high esteem by Pennsylvania consumers of GNC products.   Likewise GNC's other marks and trade names are famous in the dietary-supplement industry within the Commonwealth of Pennsylvania, and are held in high esteem by Pennsylvania consumers of GNC products.

91.    Defendants are making unlawful use of the Proprietary Marks in commerce within the Commonwealth of Pennsylvania, and the unlawful use did not begin until after the Proprietary Marks had become famous, well-recognized and held in high esteem by GNC's Pennsylvania customers.

92.    The Registered Marks GENERAL NUTRITION CENTER GNC®, GENERAL NUTRITION CENTERS® and GNC®, are famous because they have been used by GNC in Pennsylvania since approximately 1963, 1964, and 1990, respectively.  The Common Law Marks "GNC", "GNC GENERAL NUTRITION CENTERS WHERE AMERICA SHOPS FOR HEALTH", "GNC GENERAL NUTRITION CENTERS LIVE WELL", and "GNC LIVE WELL" are famous as they have been used continuously by GNC since as early as 1963, 1990, 1996 and 1997 respectively.  The Trade Names "GENERAL NUTRITION CORPORATION", "GNC CORPORATION", "GENERAL NUTRITION, INCORPORATED", "GENERAL NUTRITION CENTERS, INC.", "GENERAL NUTRITION COMPANIES, INC.", "GENERAL NUTRITION INVESTMENT COMPANY", and "GNC FRANCHISING, LLC" are also famous and have also been used continuously for a number of years.  Since those times, GNC has continued to use the Proprietary Marks in its signage and brochures in Pennsylvania.

93.    The Proprietary marks are uniquely associated with the operation of the dietary-supplement industry in Pennsylvania in which GNC is engaged.  Upon information and belief, the Defendants operate in this same dietary-supplement industry in Pennsylvania, including through the internet, and unlawfully seek to use the Proprietary Marks to compete with GNC in Pennsylvania.   Such conduct is likely to cause confusion amongst Pennsylvania consumers regarding the Proprietary Marks.

94.     Defendants' unlawful use of the Proprietary marks in Pennsylvania has diluted the distinctive quality of those marks by lessening the capacity of the distinctive marks to identify and distinguish GNC goods and services.

95.     Defendants' aforesaid conduct is in violation of 54 Pa. C.S.A. § 1124 and at all relevant times, is and has been willful, malicious, and in conscious disregard of GNC's rights under 54 Pa. C.S.A. § 1101, *et seq.*  Defendants willfully intended to trade on GNC's reputation or to cause dilution of the famous Proprietary Marks.

96.     As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its proprietary rights, and has sustained and will continue to sustain substantial injury to its business, reputation, and public goodwill in an amount that cannot be presently ascertained except by an accounting of damages.  GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein.

97.     As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts.  Furthermore, as a result of Defendants' conduct in violation of 54 Pa. C.S.A. § 1124, GNC has sustained actual and consequential damages that will be established at trial.

## COUNT 7.  DEFAMATION

98.     GNC repeats and realleges paragraphs 1-97 above as if fully set forth herein.

99.     As described above, the Defendants published the Website Statements and the January 11 Statements through press releases, internet postings, and correspondence sent to GNC franchisees.

100.     Each and every one of the disparaging statements contained in the Website Statements and the January 11 Statements is untrue, and the Defendants know that these statements are untrue, or at the very least, made the statements in reckless disregard of the truth.

101.     No privilege attaches to any of the Website Statements or the January 11 Statements.

102.     Based on the nature, wording, and defamatory character of the Website Statements and the January 11 Statements, there can be no doubt that the recipients of these statements, including internet users, customers and potential customers of GNC, customers and potential customers of Defendants, and franchisees of GNC General Nutrition Centers stores, understand the meaning of these statements and that they are meant to defame GNC.

103.     GNC has suffered special harm by publication of the Website Statements and the January 11 Statements.

104.     As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its business, reputation, goodwill, and Proprietary Marks, in an amount that cannot be presently ascertained except by an accounting of damages.   GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein.

105.     As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts. Furthermore, as a result of Defendants' conduct in violation of Pennsylvania state law, GNC has sustained actual and consequential damages that will be established at trial.

## COUNT 8.  TRADE DISPARAGEMENT

106.    GNC repeats and realleges paragraphs 1-105 above as if fully set forth herein.

107.    As described above, the Defendants published the Website Statements and the January 11 Statements through press releases, internet postings, and correspondence sent to GNC franchisees.

108.    Each and every one of the disparaging statements contained in the Website Statements and the January 11 Statements is untrue, and the Defendants know that these statements are untrue, or at the very least, made the statements in reckless disregard of the truth.

109.    No privilege attaches to any of the Website Statements or the January 11 Statements.

110.    Defendants published the Website Statements and the January 11 Statements about GNC to cause GNC to suffer pecuniary loss.  Specifically, the Defendants published Website Statements and the January 11 Statements with the express purpose of inducing GNC franchisees to breach their respective Franchise Agreements, *i.e.*, by inducing GNC franchisees to commit  (a) Domain Name Infringement Breaches, (b) Website Infringement Breaches, (c) Internet Sales Breaches, (d) Wholesaler and Competitor Breaches, (e) Post-Termination Breaches, and (f) Injury Breaches.  Unfortunately, the Defendants have met with success, and GNC has suffered pecuniary lost.

111.    As a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its business, reputation, goodwill, and Proprietary Marks, in an amount that cannot be presently ascertained except by an accounting of damages.  GNC has suffered and will continue to suffer irreparable injury that cannot be

41

adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein.

112.     As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts. Furthermore, as a result of Defendants' conduct in violation of Pennsylvania state law, GNC has sustained actual and consequential damages that will be established at trial.

### COUNT 9.  TRADE LIBEL/COMMERCIAL DISPARAGEMENT

113.     GNC repeats and realleges paragraphs 1-112 above as if fully set forth herein.

114.     As described above, the Defendants published the Website Statements and the January 11 Statements through press releases, internet postings, and correspondence sent to GNC franchisees.

115.     Each and every one of these disparaging statements is untrue, and each opinion expressed is incorrect.

116.     No privilege attaches to any of the Website Statements or the January 11 Statements.

117.     By publishing the Website Statements or the January 11 Statements to the public, including internet users, customers and potential customers of GNC, customers and potential customers of Defendants and franchisees of GNC General Nutrition Centers stores, GNC has suffered pecuniary loss.  Specifically, upon information and belief, by publishing the Website Statements and the January 11 Statements, GNC franchisees, including Franchisee Defendants, have breached their respective Franchise Agreements with GNC, *i.e.*, by (a) committing  (a) Domain Name Infringement Breaches, (b) Webpage Infringement Breaches, (c) Internet Sales

Breaches, (d) Wholesaler and Competitor Breaches, (e) Post-Termination Breaches, and (f) Injury Breaches.

118.    Due the Defendants' actions described above, GNC has suffered, and continues to suffer, pecuniary loss.

119.    In addition, and as a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its business, reputation, goodwill, and Proprietary Marks, in an amount that cannot be presently ascertained except by an accounting of damages.  GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein.

120.    As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts. Furthermore, as a result of Defendants' conduct in violation of Pennsylvania state law, GNC has sustained actual and consequential damages that will be established at trial.

### COUNT 10.  TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

121.    GNC repeats and realleges paragraphs 1-120 above as if fully set forth herein.

122.    As described above, Defendants have committed intentional and improper acts to induce GNC franchisees, including Franchisee Defendants, to breach their respective Franchisee Agreements with GNC.  Specifically, Defendants have induced GNC franchisees, including Franchisee Defendants to breach their respective Franchise Agreements, by inducing them to commit (a) Domain Name Infringement Breaches, (b) Webpage Infringement Breaches, (c) Internet Sales Breaches, (d) Wholesaler and Competitor Breaches, (e) Post-Termination Breaches, and (f) Injury Breaches.

43

123.    By intentionally and improperly interfering with GNC's Franchise Agreements between GNC and its franchisees, including Franchisee Defendants, the Defendants have caused GNC to suffer a pecuniary loss.

124.    Due to this pecuniary loss, which is a direct and proximate result of the Defendants' actions, GNC has sustained and will continue to sustain substantial injury to its business, reputation, goodwill, and Proprietary Marks in an amount that cannot be presently ascertained except by an accounting of damages.  GNC has suffered and will continue to suffer irreparable injury that cannot be adequately compensated by money damages, and which gives rise to injunctive relief of the type sought herein.

125.    As a further direct and proximate result of the wrongful acts of the Defendants, they have unlawfully derived income and profits from their wrongful acts. Furthermore, as a result of Defendants' conduct in violation of Pennsylvania state law, GNC has sustained actual and consequential damages that will be established at trial.

### COUNT 11.  FRANCHISEE DEFENDANTS' BREACH OF FRANCHISE AGREEMENTS

126.    GNC repeats and realleges paragraphs 1-125 above as if fully set forth herein.

127.    As described above, Franchisee Defendants entered into Franchise Agreements with GNC.  By engaging in the foregoing conduct, the Franchisee Defendants have materially breached the terms and provisions of their respective Franchise Agreements.  For example, Franchisees have breached their respective Franchise Agreements through (a) Domain Name Infringement Breaches, (b) Webpage Infringement Breaches, (c) Internet Sales Breaches, (d) Wholesaler and Competitor Breaches, and (e) Injury Breaches.

44

128.     In addition to breaching his Franchise Agreements by committing the acts in (a) -
(e) of the preceding paragraph, Robinson also breached his Franchise Agreements by committing
Post-Termination Breaches.

129.     As a further direct and proximate result of the wrongful acts of the Franchisee
Defendants, GNC has sustained damages that will be established at trial and irreparable harm to
GNC.

## V.   REQUEST FOR RELIEF

130.     Based on the foregoing, GNC requests judgment against the Defendants as
follows:

a.     That the Court issue a temporary restraining order, then a preliminary
injunction, and then a permanent injunction, enjoining:

1)     Defendants, and their officers, agents, servants, employees and
attorneys, as well as any persons in active concert or participation
with them, from using the domain name www.gncoperators.com;

2)     Defendants, and their officers, agents, servants, employees and
attorneys, as well as any persons in active concert or participation
with them, from using the Proprietary Marks in a manner not
expressly authorized by GNC, including:

(a)     using the name "GENERAL NUTRITION OPERATORS
ASSOCIATION" or the words "GENERAL NUTRITION"
on any websites, signs, advertising, materials, displays,
computer programs, publications, products, distributions,
press releases, copies, items of clothing and/or any other
printed or reproduced material;

(b)     using any of the Proprietary Marks in connection with any
websites, signs, advertising materials, displays, computer
programs, publications, distributions, press releases, copies,
products, items of clothing and/or any other printed or
reproduced material;

45

(c)     adopting or using any other names, marks or designs that are the same as or confusingly similar to the Proprietary Marks; or

(d)     using the Proprietary Marks in any of their corporate names, domain names or any fictitious names;

3)     Defendants, and their officers, agents, servants, employees and attorneys, as well as any persons in active concert or participation with them, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them from representing that GNOA is associated with GNC in any way;

4)     Franchisee Defendants, their officers, agents, servants, employees, and attorneys, as well as any persons in active concert or participation with them from operating a mail order, direct mail, catalog, telemarketing, wholesale, distribution or direct marketing business similar to GNC, including without limitation, through the use of the Internet, which permits customers to purchase and receive products or services which are similar to those distributed to or offered at a GNC General Nutrition Centers store without being present at a GNC General Nutrition Centers retail store;

5)     Defendants, their officers, agents, servants, employees, and attorneys, as well as any persons in active concert or participation with them, from tortiously interfering with the Franchise Agreements of any GNC franchisees by inducing them to engage in operating a mail order, direct mail, catalog, telemarketing, wholesale, distribution, direct marketing, or similar business to GNC, including without limitation, through the use of the Internet, which permits customers to purchase and receive products or services which are similar to those distributed to or offered at a GNC General Nutrition Centers store without being present at a GNC General Nutrition Centers retail store, or purchase or receive membership to GNOA or any similar organization;

6)     Franchisee Defendants, their officers, agents, servants, employees, and attorneys, as well as any persons in active concert or participation with them, from either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company owning, maintaining, advising, helping, investing in, making loans to, being employed by, engaging in, or having any interest in any similar business to GNC including without limitation any wholesale distribution, or direct marketing business

46

that offers for sale goods or services which are similar to those distributed to or offered at a GNC General Nutrition Centers store; and

7)   Defendants, their officers, agents, servants, employees, and attorneys, as well as any persons in active concert or participation with them, from conspiring with, aiding, assisting, or abetting any other person or business entity in engaging in or performing any of the prohibited activities referred to in subparagraphs 1-6 above.

b.      That the Court order the Defendants to transfer their domain name registration for www.gncoperators.com to GNC pursuant to 35 U.S.C. § 1125(d)(1)(C).

c.      That the Court order the Defendants to file with the Court and to serve upon GNC within thirty (30) days after the entry and service on the Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which the Defendants have complied with the injunction;

d.      That GNC recover all damages it has sustained as a result of the Defendants' cybersquatting, trademark infringement, unfair competition, trademark dilution, state-law unfair competition, state-law trademark dilution, defamation, trade disparagement, trade libel/commercial disparagement, tortious interference with existing contracts, and breach of contract, and recover punitive damages  in an amount sufficient to deter similar wrongdoing.

e.      That an accounting be directed to determine the Defendants' profits resulting from its cybersquatting, trademark infringement, unfair competition, trademark dilution and misleading statements, state-law unfair competition, state-law trademark dilution, defamation, trade disparagement, trade libel/commercial disparagement, tortious interference with existing contracts, and breach of contract, and that such profits be paid over to GNC and increased as the Court finds to be just under the circumstances of this case.

47

      f.         That the Court declare that this be an exceptional case and award GNC treble damages and its reasonable attorneys' fees for prosecuting this action pursuant to 15 U.S.C. §1117(a);

      g.         That the Court award GNC its reasonable costs and attorneys' fees;

      h.         That GNC recover its costs of this action and prejudgment and post-judgment interest; and

      i.         That GNC recover such other and further relief as the Court may deem appropriate.

Respectfully submitted,


Dated: February 23, 2006

/s/ Amy Kerr Parker
Gerald J. Stubenhofer, Jr.
Pa. I.D. No. 72921
Amy Kerr Parker
Pa. I.D. No. 89054
McGuireWoods LLP
Dominion Tower, 23rd Floor
625 Liberty Avenue
Pittsburgh, PA 15222-3142
Telephone No. (412) 667-7945
Facsimile No. (412) 667-7979

Of Counsel:

Craig B. Florence
Texas State Bar No. 07158016
Jennifer Sickler
Texas State Bar No. 18339600
Barry M. Golden
Texas State Bar No. 24002149
Tamara S. Pullin
Texas State Bar No. 24033038
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201
Telephone No. (214) 999-3000
Facsimile No. (214) 999-4667